**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| CHAMBERS OF<br>DEBORAH L. BOARDMAN<br>UNITED STATES DISTRICT JUDGE | 6500 CHERRYWOOD LANE<br>GREENBELT, MARYLAND 20770<br>(301) 344-0637<br>MDD_DLBChambers@mdd.uscourts.gov |

September 11, 2023

**LETTER ORDER**

RE:  *Archer v. Adventist Healthcare Inc d/b/a Adventist Healthcare White Oak Medical Center*, DLB-21-685

Dear Counsel:

In his amended complaint, Bernard Archer alleged that the care he received on July 16 and 17, 2019 at Adventist Healthcare, Inc., d/b/a Adventist Healthcare White Oak Medical Center ("Adventist"), violated the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, and that the United States, Adventist, Babak Amirshahi-Shirazi, M.D., and Medical Faculty Associates, Inc. d/b/a GW Medical Faculty Associates, Inc. ("MFA"), are liable to him under state tort law for medical malpractice, lack of informed consent, and patient abandonment. ECF 32. He then voluntarily dismissed his claims against the United States and MFA. ECF 54.

Adventist filed a motion to dismiss the EMTALA claim or, in the alternative, for summary judgment and attached medical records in support of its motion for summary judgment. ECF 45. Archer consented to dismissal of the claim without prejudice so that he could reassert it after discovery. ECF 48. Adventist insisted the claim should be dismissed with prejudice or summary judgment should be entered in its favor. ECF 49. After the parties completed significant discovery, Archer informed the Court that he now opposes the motion. ECF 62, at 1–2. The parties provided supplemental briefing and additional evidence. ECF 66, 67. The Court treats the motion as one for summary judgment. Fed. R. Civ. P. 12(d). Because Archer cannot prove an EMTALA claim, Adventist's motion for summary judgment is granted.

**I.  EMTALA**

Congress passed EMTALA out of a "concern that hospitals were abandoning the longstanding practice of providing emergency care to all due to increasing pressures to lower costs and maximize efficiency." *Brooks v. Md. Gen. Hosp., Inc.*, 996 F.2d 708, 710 (4th Cir. 1993). The legislature enacted the statute "to require hospitals to continue to provide" emergency care instead of "'dumping' patients unable to pay, by either refusing to provide emergency medical treatment or transferring patients before their emergency conditions were stabilized." *Id.*

EMTALA requires a hospital that provides emergency care to "stabilize [an emergency medical] condition or, if medically warranted, . . . transfer the person to another facility if the benefits of transfer outweigh its risks." *Id.*; *see* 42 U.S.C. § 1395dd(b)(1). A hospital breaches its statutory duty to stabilize an emergency room patient if it discharges the patient directly from the emergency room without first stabilizing the emergency medical condition or transfers the patient to another hospital without "provid[ing] such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual . . . ." 42 U.S.C. § 1395dd(e)(3)(A); *see Williams v. Dimensions Health Corp.*, 952 F.3d 531, 535–36 (4th Cir. 2020); *Bryan v. Rectors & Visitors of Univ. of Va.*, 95 F.3d. 349, 351–52 (4th Cir. 1996). The statute provides that "[a]ny individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of [EMTALA]" may sue the hospital in a civil action for damages. *Johnson v. Frederick Mem'l Hosp., Inc.*, No. WDQ-12-2312, 2013 WL 2149762, at *3 (D. Md. May 15, 2013) (quoting 42 U.S.C. § 1395dd(d)(2)(A)).

A hospital's good-faith admission of a patient for inpatient treatment terminates the hospital's obligations under EMTALA and is a defense to an EMTALA claim. *Williams*, 952 F.3d at 536–37; 42 C.F.R. § 489.24(a)(1)(ii) (When a "hospital admits [an] individual [from its emergency department] as an inpatient for further treatment, the hospital's obligation under [EMTALA] ends."). This defense applies even if the patient has not been stabilized. *Williams v. Dimensions Health Corp., Inc.*, No. PWG-16-4123, 2018 WL 2445571, at *4 (D. Md. May 30, 2018), *aff'd sub nom. Williams v. Dimensions Health Corp.*, 952 F.3d 531 (4th Cir. 2020); *Johnson*, 2013 WL 2149762, at *5.

Liability under EMTALA is limited. EMTALA "impos[es] on a hospital's emergency room the duty to screen all patients as any paying patient would be screened and to stabilize any emergency condition discovered." *Brooks*, 996 F.2d at 711. It "is not a malpractice statute," and it does not "provide a federal remedy for misdiagnosis or general malpractice." *Id.* at 710, 711. If a hospital admits a patient, its duties under EMTALA end, and a plaintiff's legal remedy lies in tort only. *Id.*; *see Bryan*, 95 F.3d at 351 (noting that after the hospital "undertakes stabilizing treatment for a patient who arrives with an emergency condition, the patient's care becomes the legal responsibility of the hospital and the treating physicians" and any "refusal of treatment after the establishment of a physician-patient relationship would be regulated by the tort law of the several states").

## II.     Standards of Review

Summary judgment is appropriate when the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To meet its burden, the party must identify "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" in support of its position.

Fed. R. Civ. P. 56(c)(1)(A).  The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).  The Court must "view the evidence in the light most favorable to the nonmoving party" and avoid "weigh[ing] the evidence or mak[ing] credibility determinations." *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017) (quoting *Jacobs v. N.C. Admin. Off. of the Courts*, 780 F.3d 562, 568–69 (4th Cir. 2015)) (internal quotation marks omitted).  However, the Court also must abide by its "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial."  *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993) (quoting *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987)) (internal quotation marks omitted).

If the moving party demonstrates "an absence of evidence to support the nonmoving party's case," the burden shifts to the nonmoving party to "present specific facts showing that there is a genuine issue for trial." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015).  A factual dispute is genuine only where there is sufficient evidence to permit a reasonable jury to find in the nonmoving party's favor.  *Id.*; *see also Perkins v. Int'l Paper Co.*, 936 F.3d 196, 205 (4th Cir. 2019).  "To create a genuine issue for trial, 'the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence.'"  *Humphreys & Partners Architects*, 790 F.3d at 540 (quoting *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013)).

### III.    Discussion

The dispositive question here is whether there is a genuine dispute of material fact that Adventist admitted Archer to the hospital as an inpatient.  Upon review of the record evidence, the Court concludes there is no genuine dispute that Adventist admitted Archer into the hospital as an inpatient on July 16, 2019.  When it did, its obligations under EMTALA ended.

Under EMTALA, an "inpatient" is defined as:

> an individual who is admitted to a hospital for bed occupancy for purposes of receiving inpatient hospital services as described in § 409.10(a) of this chapter with the expectation that he or she will remain at least overnight and occupy a bed even though the situation later develops that the individual can be discharged or transferred to another hospital and does not actually use a hospital bed overnight.

42 C.F.R. § 489.24(b).  With this definition in mind, the Court turns to the record evidence.

Archer arrived at Adventist's emergency room to receive medical treatment on July 16, 2019.  ECF 67-1, at 1.  At 2:43 p.m. on that day, James Clement, M.D. agreed to admit Archer to the Intermediate Care Unit ("IMCU") as an inpatient, and a bed was requested for him.  *Id.* at 4, 10.  Dr. Shirazi entered an order to "Admit Patient To Inpatient," signed by Dr. Clement and an

emergency room nurse, and Archer was admitted to inpatient care at 2:49 p.m. *Id.* at 11; ECF 67-2, at 1. The order included Dr. Shirazi's certification that his "determination [to admit Archer was] in accordance with [his] understanding of CMS requirements for reasonable and necessary inpatient services." ECF 67-2, at 1. Dr. Shirazi then entered a Medical-Surgical Admission Care Plan at 2:55 p.m., and at 4:25 p.m., Archer was assigned an inpatient bed. ECF 67-1, at 6, 23. He was discharged from the emergency department at 7:58 p.m. *Id.* at 4. The 8:44 p.m. record cataloging his belongings noted that the order was "entered secondary to inpatient admission." *Id.* at 24. His "Medication Profile" reflects treatment as an inpatient on July 16 and 17. *Id.* at 18–22. And, the progress notes state that he was seen at 2:01 a.m., an MRI of his head and brain was ordered, and a neurosurgeon would be called in the morning for a consultation. *Id.* at 25. This evidence establishes that Archer met the definition of inpatient under 42 C.F.R. § 489.24(b).

Archer insists he was not admitted as an inpatient. He says he was placed under "23 Hour Observation" and that patients admitted to the hospital under observation status do not meet CMS's regulatory definition of "admitted" under 42 C.F.R. § 498.24. ECF 66-1, at 8. In support of this position, he points to deposition testimony of Dr. Shirazi who testified that he "believe[d]" based on reviewing a summary of Archer's hospital orders that he "admit[ted] him under observation." ECF 66-3, at 3. Dr. Shirazi explained that "observation means that he's continuing the ER visit and we are expecting that the patient may get – improve quickly and then that between one day or two we discharge the patient," as opposed to "full admission," which happens if the physician "think[s] that the patient needs to stay in the hospital more than two nights." ECF 66-6, at 3. Archer contends this testimony is bolstered by similar testimony from expert witnesses Robert Chow, M.D. and Paul Genecin, M.D. ECF 66-10, at 3 (Chow Dep. 12:5–14) (Archer "wasn't actually admitted to a floor," but rather "was transferred to . . . 23-hour observation"); ECF 66-5, at 4 (Genecin Dep. 115:16–18) (Archer "was never really admitted to the hospital, he was in on observation status"). All this testimony was in response to questioning that focused the witnesses on a single medical record from July 17, 2019 at 10:58 a.m. that indicated that Dr. Shirazi changed Archer's status at that time to "an observation patient." ECF 66-2, at 26. But this status change, which occurred four minutes before his discharge, was for administrative purposes so that Archer would be "billed at the observation rate" rather than the inpatient rate. ECF 67-4, at 6 (Rost Dep. 34:13–19, 41:12–19). According to Dr. Rost, "[f]rom an administrative standpoint, Mr. Archer was changed that morning to the observation status. But prior to that order, from 2:49 until that morning, he received clinical care as an inpatient." *Id.* (Rost Dep. 35:4–8). Dr. Rost explained that "the fact that he was changed from an administrative lens to a[n] observation patient . . . does not change or negate the fact that he was an inpatient during the prior 20 hours of his care." *Id.* (Rost Dep. 35:4–8). Nothing in the record contradicts Dr. Rost's testimony or the medical records showing that Archer was admitted and received inpatient care from 2:49 p.m on July 16, 2019 until 10:58 a.m. on July 17, 2019, when his status was administratively changed moments before his discharge. The testimony of Drs. Shirazi, Chow, and Genecin does not raise a genuine dispute of material fact precluding summary judgment for Adventist on the EMTALA claim.

Because there is no genuine dispute of material fact that the hospital admitted Archer as an inpatient for further treatment on July 16, he cannot prevail on his EMTALA claim. Adventist's motion for summary judgment on the EMTALA claim is granted. Archer's legal remedies against the hospital lie in tort.

With the EMTALA claim no longer pending, the only remaining claims are the tort claims for medical malpractice, lack of informed consent, and patient abandonment against Adventist and Dr. Shirazi. The Court does not have original jurisdiction over these claims and may decline to exercise supplemental jurisdiction over them. 28 U.S.C. § 1367(c)(3); *see ESAB Grp., Inc. v. Zurich Ins. PLC*, 685 F.3d 376, 394 (4th Cir. 2012); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 353–57 (1988). Courts consider "the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over . . . pendent state-law claims." *Carnegie-Mellon*, 484 U.S. at 350. "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Id.* at 350 n.7.

This Court routinely declines to exercise jurisdiction over state law claims if all federal claims have been dismissed. *See, e.g.*, *Conkel v. Family & Children's Servs.*, No. JKB-13-331, 2013 WL 2105854, at *1 (D. Md. May 13, 2013); *NRT Mid-Atl., LLC v. D'Ambrosia*, No. DKC-08-166, 2008 WL 11367473, at *1 (D. Md. Dec. 22, 2008). There is no reason to depart from that approach here. All federal claims have been eliminated before trial, and although discovery is nearly complete, the Court does not have specialized knowledge of the facts or remaining claims that would make it more economical, convenient, or fair for the case to remain in federal court. The remaining claims raise only questions of state law, and "[n]eedless decisions of state law [by federal courts] should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *Medina v. L & M Constr., Inc.*, RWT-14-0329, 2014 WL 1658874, at *2 (D. Md. Apr. 23, 2014) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)) (alteration in *Medina*). Accordingly, the Court declines to exercise supplemental jurisdiction over the remaining state law claims, which are dismissed without prejudice. The Clerk shall close this case.

Despite the informal nature of this letter, it will constitute an Order of the Court and will be docketed accordingly.

Sincerely,

Deborah L. Boardman
United States District Judge